**REVERSE and REMAND; and Opinion Filed August 30, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

_____

### No. 05-19-00346-CV
_____

## IN THE INTEREST OF A.T., A CHILD

On Appeal from the 256th Judicial District Court
Dallas County, Texas
Trial Court Cause No. DF-07-22153

## MEMORANDUM OPINION

Before Justices Brown, Schenck, and Pedersen, III
Opinion by Justice Schenck

C.T. (Father) appeals the trial court's order terminating his parental rights to his son, A.T.

In six issues, Father challenges the legal and factual sufficiency of the evidence to support findings

of the trial court[1] and claims his fundamental rights were not adequately recognized and protected.

Father asks that the Department of Family and Protective Services (the "Department") remain the

managing conservator of A.T. and that he and Mother be named possessory conservators. We

reverse two specific rulings in the trial court's Final Order in Suit Affecting the Parent–Child

Relationship and Decree of Termination and, in the interest of justice, remand this case to the trial

court for further proceedings. Because the dispositive issue in this case is settled in law, we issue

this memorandum opinion. See TEX. R. APP. P. 47.4.

---

[1] More particularly, Father claims the evidence is insufficient to support findings that: naming the Department managing conservator of A.T., naming the mother possessory conservator, and terminating the parent-child relationship between Father and A.T. is in the best interest of the child; Father constructively abandoned A.T., the Department made reasonable efforts to return the child to the parent and the parent demonstrated an inability to provide the child with a safe environment; Father failed to comply with provisions of a court order; and termination of Father's rights is in the best interest of A.T.

BACKGROUND

At trial, the Department sought to terminate all parental rights to three children: A.T. who was eleven years old at the time, and his half-brothers, K.F. and M.F., who are twins and were five years old at the time. A.T. and the twins share the same mother, A.C. (Mother), though they have different fathers.

Beginning in May of 2016, the Department received referrals concerning Mother's treatment of the children that culminated in the Department seeking to remove them and initiate proceedings to terminate parental rights. In total, the Department received four or five referrals cumulatively asserting Mother was not following up on the twins' medical care, Mother and the children might be homeless, and there may have been instances of physical abuse by Mother against Mother's daughter, A.W.[2]

Initially, the Department's plan was for reunification. After deciding reunification was not a viable option, the Department filed its Original Petitions for Protection of Children, for Conservatorship and for Termination, in the Suit Affecting the Parent–Child Relationship seeking to terminate the parental rights of both Mother and Father as to A.T. and the parental rights of both Mother and the father of K.F. and M.F. as to them. The Department took custody of the children, and the trial court named the Department temporary managing conservator. A.T. and the twins were placed into foster care.[3]

At the time of these events, Father lived in a two bedroom apartment with his parents, his brother, and a friend of his brother. He was not involved in the circumstances giving rise to the referrals and the removal of A.T. from his mother. Upon removal, the Department contacted

---

[2] Initially, the Department also sought to terminate the parental rights to A.W., who is A.T.'s half-sister. She was fifteen years old at the time of trial. The case concerning A.W. was resolved by a mediated settlement agreement and, thus, did not proceed to trial. A.W. was placed in the home of Mother's maternal aunt.

[3] The twins were placed in the same foster home and A.T. had approximately six foster placements during the eighteen month pendency of the case.

Father regarding the placement of A.T. Father expressed an interest in caring for A.T. but the Department refused to place the child with him due to the lack of adequate space in the two bedroom apartment, and because Father's brother had a criminal history involving sexual assault of a child. At the time of removal, Father was in contact with A.T., through Mother's maternal aunt, with whom Mother and the children had been living.

On September 20, 2017, the trial court ordered Mother to complete a list of services, including parenting classes, psychological and psychiatric evaluations, individual counseling, and random drug and alcohol urinalysis/hair strand tests. More than six months later, on April 25, 2018, the trial court ordered Father to complete a list of services, including psychological evaluation, individual counseling, and initial drug tests with follow up drug tests as necessary. There is no indication in the record as to what precipitated the trial court's imposition of service obligations on Father.

At a bench trial commencing on February 11, 2018, the Department presented four witnesses, Kristy Brukelman, Jeanee Thompson, the Court Appointed Special Advocate (CASA) assigned to the case, and the guardian ad litem for Mother. Father appeared and testified on his own behalf and the guardian ad litem for the children made a statement after the parties rested. The twins' father did not appear, but was represented by counsel.

Brukelman is a Child Protective Services (CPS) Family Based Safety Services caseworker. She testified that although the case had been initially referred to the Department in May of 2016, the case was not referred to her until July or August of 2017. She explained the delay in the referral was due to difficulty in locating Mother during the investigation stage, and once she was located she was unwilling to cooperate with CPS caseworkers. Consequently, a Department investigator had to go through the court to get an order requiring Mother to participate. Brukelman's first contact with Mother was in August of 2017. At that time, Mother and the children were living

with Mother's maternal aunt, who worked for the Dallas Independent School District and was away from the home during school hours. In total, Brukelman went to maternal aunt's house on three or four occasions. She learned the oldest child, A.W., often took care of the younger children and Mother was sometimes present in the home and sometimes not. She described Mother as being very uncooperative. She told Brukelman to get out of the house and that she was not going to work services. Brukelman testified Mother appeared to be suffering from mental health issues. A decision was made to stop family based services and request the removal of the children primarily because: (1) the oldest child, A.W., was administering medication to the twins without knowing how much she was giving and without being monitored by an adult; and (2) there was not an adult home at all times with two children who had medical needs, those being the twins, and one with behavioral issues, that being A.T. Maternal aunt did not want to be considered as a permanent placement option for the children and expressed a desire to formally evict Mother.

Brukelman indicated she was able to make contact with the children's biological fathers. As to Father, Brukelman explained she met with him at his parents' two bedroom apartment. Father expressed to her his interest in caring for A.T. Father told her that he calls Mother's maternal aunt to arrange visits with A.T. and that he attempts to visit when Mother is not present. Brukelman confirmed with Mother's maternal aunt that she had no difficulty with Father and that he would contact her about visits. Brukelman advised Father CPS could not place A.T. with him because there was not enough room at the apartment and because of his brother's presence and criminal history. She explained that the only bar in placing A.T. with Father was his residing in a home with his brother, who had a criminal and CPS history. Father indicated to her that he was going to work on getting his own place so he could provide a safe environment for A.T.

Thompson is a CPS caseworker in the conservatorship unit. Thompson testified she was assigned to this case in August of 2018. There were two caseworkers before her. She testified

–4–

about the services Mother and Father were to complete. She indicated Mother started her individual counseling but her therapists discharged her for aggressive and uncooperative behavior. Mother passed her drug test. Thompson indicated Mother told her she was self-employed by an insurance company she owned and was residing with various people and had no stable housing or living environment. Regarding Father, she indicated he was to complete psychological evaluation, individual counseling, a drug test and depending on the results he would continue on with additional drug tests. Thompson indicated her records reflected that Father had not completed the services.

Regarding A.T., Thompson testified he is in a foster home and behaviorally he has improved significantly. He is on target academically and developmentally. She explained that the foster parent is not willing to adopt A.T. but is willing to care for him until he is 18 years old. Thompson indicated Mother has visited A.T., although her visits have been inconsistent, meaning she visits once or twice a month, instead of once a week.

Thompson stated the Department was asking to have both Mother and Father's parental rights terminated. As to Father, the Department was asking to have his rights terminated due to his failure to complete services. In addition, Thompson stated the Department had concerns about placing A.T. with Father because it does not know if he has a stable, drug free living environment, and does not know if Father's caring for A.T. is in the best interest of A.T., and because Father has not had any contact with A.T. and has not displayed any concerns about A.T. throughout the 18 month duration of the referral.

Thompson testified that A.T. indicated he would like to be placed with family. She explained CPS explored family members as possible options for placements, but the parents did not provide names and the children were not helpful in this regard. When questioned about the

best interest of the children, Thompson simply indicated the children are very bonded to each other and it would be in the best interest of the children to maintain contact with each other.

The CASA volunteer testified she has not seen Father at any of the visits with A.T. A.T. has never mentioned his father to her. She indicated the children are thriving in foster care and that she has not seen anything that would warrant return of the children. She further stated there is no indication the parents can provide a safe environment for the children. When questioned by Father's attorney she stated that if Father could demonstrate that he could provide a safe, permanent environment for A.T. she would consider recommending that A.T. live with Father.

Father testified that after the referral he was ordered to do three things: submit to a psychiatric evaluation, a drug test and counseling classes. He indicated he had just completed the psychiatric evaluation with Amanda Dartson. As to individual counseling, Father stated he was working two jobs and his work schedule prohibited him from attending counseling during the week and he called a couple of places, including the Family Place, but could not find a facility that offered counseling on Saturdays. Father also stated he suffers from health issues, including diabetes, anxiety, and high blood pressure, and claimed he had been hospitalized three times for a week at a time since this case started. Father pays child support for A.T. and two other children, although he is behind on payments. He was living with his mother and claimed he had been saving money and would be getting a home of his own on April 1. He indicated that, if A.T. were to live with him, his mother would help to look after him. He further stated his girlfriend, who was pregnant at the time of trial, might live with him as well. Father stated he loves A.T. and that, although his visitation schedule had been erratic, he did communicate with A.T. as Mother's aunt would let him video chat with A.T. and he would sometimes go to the house and throw a football.

Father testified he last saw A.T. around September or October of 2018, four or five months before trial. He explained he did not attend any of the scheduled visitations at the Department

because they were scheduled during times he was working. Father claimed he was only contacted by the first caseworker and he did not have contact with the subsequent caseworkers. Father asked the court as a possible alternative to placement of A.T. with him to name the Department conservator and to retain his rights to A.T. so that he could receive information concerning A.T., visit A.T., and request modification once he got his living situation together. Father indicated that if A.T. were to live with him he would facilitate contact between A.T. and his siblings. On cross examination, Father admitted that he had been accused of family violence toward Mother in 2007. He was placed on probation in connection with that incident and had completed same before the removal of A.T. He also had an altercation with his daughter's grandfather in 2006.

At the close of evidence, the guardian ad litem for the children argued against termination stating termination of both parents would have a devastating effect on the children. She further indicated that she had learned Father had been in touch with A.T. through the aunt and believed that the parents could be rehabilitated. She could not recommend termination based on the relationship she had seen between the children. She believed it would be in the best interest of the children to remain in their current placements, to continue sibling visits, and to name the Department managing conservator.

The trial court found Mother knowingly placed or allowed A.T. to remain in conditions or surroundings which endangered the physical or emotional well-being of A.T., had engaged or knowingly placed A.T. with persons who engaged in conduct which endangered the physical or emotional well-being of A.T., had constructively abandoned A.T. and the Department had made reasonable efforts to return A.T. to Mother, Mother had not regularly visited or maintained significant contact with A.T., and mother had demonstrated an inability to provide A.T. with a safe environment, and had failed to comply with the provisions of a court order that specifically established the actions necessary for Mother to obtain the return of the child. TEX. FAM. CODE

ANN. § 161.001(b)(1)(D), (E), (N), (O).  Nevertheless, the trial court found that termination of the parent–child relationship between Mother and A.T. is not in the best interest of A.T.  The court appointed the Department sole managing conservator and Mother possessory conservator of A.T.  The court further ordered that A.T. would remain in his current placement for at least 120 days and that the Department was to exhaust all possible maternal and paternal family placement options.  The order provided Mother with visitation only at times that A.T. is not attending school.  If Mother misses more than two consecutive visits, her possession and access shall be suspended until further court order.  The order also provide for weekly sibling visits.

The trial court found Father had constructively abandoned A.T. and the Department had made reasonable efforts to return the child to Father, Father had not regularly visited or maintained significant contact with A.T., Father had demonstrated an inability to provide A.T. with a safe environment, and has failed to comply with the provisions of a court order that specifically established the actions necessary for Father to obtain the return of the child.  *Id.* § 161.001(b)(1)(N), (O).  The court further found that termination of the parent–child relationship between Father and A.T. is in the best interest of A.T.  The court ordered Father be terminated, foreclosed and divested of any rights as to A.T.  Father appeals.

## DISCUSSION

We begin by stressing that neither the wisdom of the trial court's decision to maintain the parent–child relationship between Mother and the children nor the decision to appoint her possessory conservator is before us.  Likewise, the question on appeal is not whether Father would be a superior custodial placement for A.T. at present.  Rather, the issue before us is whether a termination of Father's parental rights over his protestation was proper on the record before us.

The involuntary termination of parental rights involves fundamental constitutional rights. *In re G.M.*, 596 S.W.2d 846 (Tex. 1980).  The Supreme Court has stated that a natural parent's

–8–

desire for—and his right to—the companionship, care, custody, and management of his child is an interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982). A termination decree is final and irrevocable, divesting for all time that natural right as well as all legal rights, privileges, duties, and powers between the parent and child except for the child's right to inherit. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Courts have recognized that termination of a parent's rights to his child is "traumatic, permanent, and irrevocable." *In re M.S.*, 115 S.W.3d 534, 549 (Tex. 2003). For these reasons, the Texas Family Code and the Due Process Clause of the United States Constitution require that grounds for termination of parental rights be proved by clear and convincing evidence. FAM. § 161.001; *Santosky*, 455 U.S. at 753–54. And for the same reasons, we strictly construe involuntary termination statutes in favor of the parent. *In re E.R.*, 385 S.W.3d 552, 563 (Tex. 2012).

To apply the clear and convincing evidence standard of proof in parental termination cases, we ask whether the proof is such that a reasonable fact finder could have formed a firm belief or conviction about the truth of the allegations. *In re J.F.C.*, 96 S.W.3d 256, 263–64 (Tex. 2002). In our legal sufficiency review, we consider all the evidence in the light most favorable to the finding. *Id.* at 266. We assume that the fact finder resolved disputed evidence in favor of the finding if a reasonable fact finder could do so, and we disregard all contrary evidence that a reasonable fact finder could have disbelieved or found incredible. *Id.* For a trial court to terminate a parent's right to his child, the State must prove by clear and convincing evidence that the parent committed an act prohibited under the family code's section 161.001(b)(1) *and* that termination is in the child's best interest. FAM. § 161.001(b)(1–2).

Because Father's fifth issue, challenging the sufficiency of the evidence to support the best interest finding, is dispositive of this appeal, we begin our analysis there.[4] It is the Department's burden to establish by clear and convincing evidence that termination is in the child's best interest. *Id.* § 161.001(b)(2). But there is a strong presumption that the child's best interest will be served by preserving the parent-child relationship. *In re J.F.C.*, 96 S.W.3d at 294.

The Department relied on Thompson and the CASA volunteer to offer evidence of the best interest of A.T., and the other children, in this case. With regard to the best interest of the children, and concerns over placing the children with the fathers, the following exchanges occurred between counsel and Thompson:

[Department Attorney] Do you have concerns of placing these children back with the fathers based on the communication you had with them, if that was an option?

[Thompson] Yes.

Q. And why is that a concern for you?

A. Because we don't know who these guys are. We don't know if they have a stable, drug free living environment. We don't know if they're caring for the child that's in their best interest because they have not had any contact or displayed any concerns throughout the duration of the 18 months.

Q. And when you say had any contact, have the fathers visited their children?

A. No.

. . . .

Q. Do you believe that termination of the parents' rights in this case would be in the best interest of the children, [K.W., M.W., and A.T.]?

A. Yes.

[Counsel for mother] So there is a possibility that the kids could be placed in different homes and lose contact with each other?

---

[4] As more fully set forth herein, Father directly challenges the sufficiency of the evidence supporting the trial court's predicate finding under subsection O of section 161.001(b)(1), that Father failed to comply with the provisions of a court order that specifically established the actions necessary for Father to obtain the return of the child, in view of the fact that A.T. was not removed due to his alleged abuse or neglect, we would conclude the evidence is insufficient to support the finding. In view of our determination on the trial court's best interest finding, though the evidentiary matters overlap, we pretermit that sufficiency question. For the same reason, we pretermit the sufficiency of the evidence to support the trial court's predicate finding under subsection N of section 161.001(b)(1), that Father constructively abandoned A.T.

–10–

[Thompson]  It's a possibility.

Q.  Do you believe that would be in the best interest of the children?

A.  No.

[Counsel for the father of the twins]  And I believe that you've been asked this before, but it's really to all these children's best interest that they maintain contact with one another growing up?

[Thompson]  Correct.

As to the best interest of the children, and concerns over placing them with the fathers, the following exchange occurred between counsel and the CASA volunteer:

[Counsel for Father]  And so can you just -- my client is here and so can you just tell the Court and my client what your concerns are about my client, about the child going to my client?

[CASA Volunteer]  Well, the main concerns are we don't know where he resides.  We don't know where he lives at, who he lives with.  If it's a safe and drug free environment.  We don't know anything about him at all and his relationship with [A.T.], because as I've had the case since August, I've never seen him, heard from him or even can describe the relationship that he and [A.T.] have.

Q.  And so namely your biggest concern is not knowing, right, sounds like your main concern, your lack of knowledge?

A.  Yeah, we don't know any of the safety issues or if he's employed, how does he make money, how would he take care of [A.T.], who would transport him back and forth to school, medical and dental appointments.  We don't have any of that information.

Q.  And those are all things that you are concerned about, right?

A.  Correct.

. . . .

Q.  And so you talked about the importance of the children maintaining contact with each other, do you think if [A.T.] was to go to my client that that would help in that situation to help the children stay in contact with each other?

A.  I'm not sure because I don't know anything about your client.

[Counsel for Mother]  And so you understand the legal ramifications of termination means that these children might lose tract of each other?

[CASA volunteer]  I do.

–11–

Q. And do you think that would be in their best interest?

A. I think it would be unfortunate, but at this point I don't see any alternative.

[Guardian ad Litem for the Children] Have you observed [A.T.] with his foster mom?

[CASA Volunteer]. Yes.

Q. How would you describe their relationship?

A. She is strict but kind. He describes her as fair, affectionate and he tells me he's happy there.

Q. Would you - - would you agree that it's probably in their best interest to stay in those homes?

A. Yes.

This evidence, at best, showed it was in the best interest of the children to maintain contact with each other and demonstrates that the Department was seeking to terminate the fathers' parental rights, more or less as a class, and based on a lack of information, as to the whole, it is, of course, the Department's burden to present clear and convincing evidence that termination of Father's parental rights is in the best interest of A.T. As demonstrated herein, in this case, the Department fell woefully short of meeting its burden as to this father.[5]

In determining whether termination is in the child's best interest, we may consider several factors, including (1) the child's desires, (2) the emotional and physical needs of the child and the emotional and physical danger to the child now and in the future, (3) the parental abilities of the individuals seeking custody, (4) the plans for the child by those individuals and the stability of the home, (5) the plans for the child by the agency seeking custody and the stability of the proposed placement, and (6) the acts or omissions of the parent which may indicate the existing parent-child relationship is not a proper one, and (7) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This is not an exhaustive list, and a court need

---

[5] As noted previously, unlike A.T.'s father, the fathers of Mother's other children made no effort to contest their termination or to appeal that result. A.T.'s father, as detailed below, made substantial efforts to engage A.T. as a parent once the State informed him of Mother's shortcomings and these termination proceedings.

not have evidence on every element listed in order to make a valid finding as to the child's best interest. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). In addition, the Texas Family Code sets out factors to be considered in evaluating a parent's willingness and ability to provide the child with a safe environment. *See* FAM. § 263.307(b); *see also In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (citing Family Code Section 263.307 and *Holley* as containing factors to consider "when determining whether termination of parental rights is in the best interest of the child").

A.T. was eleven years old at the time of trial. The only evidence offered by the Department as to A.T.'s desires is that he prefers to be with family. This evidence weighs against termination.

While the Department presented evidence that in the past A.T. had some behavioral problems, the evidence established those issues had resolved and the Department did not offer evidence of unusual emotional and physical needs of A.T. Accordingly, the second *Holley* factor is neutral in our analysis.

The evidence established the Department knew nothing of Father's parental abilities. There was no evidence of any referrals concerning father's other children. To the extent the trial court considered Father's failure to complete the ordered services to support a conclusive that this *Holley* factor supports termination, we conclude doing so was error in this case. A failure to complete services can serve as a predicate act for involuntary termination if the Department proves by clear and convincing evidence that the parent has:

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months *as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.*

FAM. § 161.001(b)(1)(O) (emphasis added). The Texas Supreme Court has held that subsection (O) requires the Department to prove that the child was removed from her parent because of abuse or neglect. *In re E.C.R.*, 402 S.W.3d 239, 246 (Tex. 2013); *see also R.J.O. v. Tex. Dep't of Family*

*& Protective Servs.*, No. 03-13-00478-CV, 2013 WL 6060778, at \*1 (Tex. App.—Austin Nov. 13, 2013, no pet.) (evidence insufficient to terminate father's rights under section (O) when children were in mother's custody when they were removed, father was not living in house with children, and they were not removed from father's care).

The Department offered evidence that A.T. was placed in the conservatorship of the Department as a result of abuse and neglect by Mother, *not Father*. At the time of the referral and removal, A.T. was in Mother's custody and Father was not living in the house with them and A.T. was not removed from Father's care. Given that the evidence undermines application of subsection (O), we conclude evidence that Father failed to follow the service plan cannot, of it own weight, serve as clear and convincing evidence of A.T.'s best interest. *See In re M.K.*, No. 05-18-01297-CV, 2019 WL 2283886, at \*4 (Tex. App.—Dallas May 29, 2019, no pet.) (mem. op.). On account of non-custodial parent's failure to complete services imposed by an arm of the State, without apparent reason no less,[6] terminating parental rights would result in a rigid, and mechanistic sanction. Accordingly, the third *Holley* factor weighs against termination.

As to the plans for A.T. by the respective parties, Father has sought to have A.T. live with him once he gets his own apartment, while the Department has no permanent placement plan for him now that Mother's parental rights have not been terminated. Thus, we conclude the fourth and fifth factors weigh against termination.

The Department presented no evidence of any wrongful acts or omissions of Father, which may indicate the existing parent-child relationship is not a proper one. Thus, nether the sixth or seventh factors weigh against termination.

---

[6] The record is silent as to why CPS directed Father to participate in the service plan. While we have no doubt of CPS's sincerity in seeking the plan or of its benefit in facilitating positive parenting techniques, the question presented here is whether failure to complete the plan results in a default whereby the State supplants the parent.

The record contained affirmative evidence that at the time the trial court terminated his parental rights Father was working towards obtaining an apartment of his own, was working two jobs, paying child support, albeit incompletely, visiting A.T. and fighting to maintain his rights as a parent. Because Father was working two jobs, his ability to work the services ordered and to attend visitation at CPS's headquarters at the scheduled times was impacted. Father had been in communication with A.T. as recent as four months before trial. Father loves his son and wants to provide a suitable home for him and to foster his relationships with his siblings. To be sure, he failed to attend services as directed by the trial court, but no opinion from this Court or any other supports termination of a non-custodial parent's rights for failure to attend services, in the absence of a prior concurrence to that effect. The record as a whole may not have established that Father was ready to take on A.T. full custody. But no reasonable factfinder could have formed a firm belief or conviction that termination of Father's parental rights at this time was in A.T.'s best interest. *In re J.F.C.*, 96 S.W.3d at 266. The evidence is legally insufficient to support the trial court's finding to the contrary.

We do not conclude that A.T.'s best interest is to be transferred immediately to Father's custody and control. It is possible that his best interest is to remain for some time with another family member or in foster care while Father's status is evaluated. But the Department is required to meet its burden of proof, and the evidence introduced at trial fails, at this juncture, to overcome the presumption in favor of preserving the parent–child relationship.

We sustain Father's fifth issue. Because of our disposition of Father's fifth issue, we need not address his remaining issues. TEX. R. APP. P. 47.1.

## CONCLUSION

We reverse the provisions in the trial court's Final Order finding termination of the parent-child relationship between Father and A.T. is in the best interest of the child and ordering and

decreeing that Father be terminated, foreclosed and divested of any rights as to A.T. We remand this case to the trial court for further proceedings in accordance with this opinion.


/David J. Schenck/
DAVID J. SCHENCK
JUSTICE

190346F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF A.T., A CHILD

No. 05-19-00346-CV

On Appeal from the 256th Judicial District Court, Dallas County, Texas
Trial Court Cause No. DF-07-22153.
Opinion delivered by Justice Schenck. Justices Brown and Pedersen, III participating.

In accordance with this Court's opinion of this date, the trial court's Final Order in Suit Affecting the Parent–Child Relationship and Decree of Termination in this cause is **REVERSED** and **REMANDED** in party. We **REVERSE** that portion of the trial court's order (1) finding termination of the parent–child relationship between A.T. and his father is in the best interest of the child and (2) decreeing that A.T.'s father be terminated, foreclosed and divested of any rights as to A.T.

We **REMAND** the revised portion of this cause to the trial court for further proceedings consistent with this opinion.

Judgment entered this 30th day of August, 2019.